The CONE CORPORATION, J.W. Conner & Sons, Cone Constructors, Inc., Dallas 1 Construction & Develp. etc., et al., Plaintiffs–Appellees,

v.

HILLSBOROUGH COUNTY, Larry J. Brown, Defendants–Appellants.

Nos. 89–3976, 90–3185 and 90–3191.

United States Court of Appeals, Eleventh Circuit.

Aug. 13, 1990.

---

Herbert P. Schlanger, Atlanta, Ga., Maxwell G. Battle, Jr., Dunedin, Fla., for plaintiffs-appellees.

Before FAY and JOHNSON, Circuit Judges, and GIBSON *, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Hillsborough County, Florida, and Larry J. Brown, Administrator of Hillsborough County ("the County") appeal from the district court's grant of summary judgment in favor of plaintiffs/appellees The Cone Corporation, J.W. Conner & Sons, Inc., Cone Constructors, Inc., and Dallas 1 Construction & Development, Inc., a group of general contractors doing business in Hillsborough County ("the Cone group"). The County also appeals from the lower court's grant of a permanent injunction prohibiting operation of Hillsborough County's Minority Business Enterprise law ("MBE law").

## I. STATEMENT OF THE CASE

### A. *Background*

In the mid–to–late–1970s, federal agencies that funded state and local construction projects began to impose minority participation requirements on entities wishing to receive grants.[1] As a result of these requirements, Hillsborough County initiated a Minority Business Enterprise ("MBE") program in 1978.[2] The County

Claude Tison, Jr., Tampa, Fla., for defendants-appellants.

* Hon. Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. The County cites the Public Works Employment Act of 1977, P.L. 95–28, 91 Stat. 116, and the Surface Transportation Assistance Act of 1982, P.L. 97–424, 96 Stat.2097, as examples of federal statutes requiring minority participation. The County also refers to a 1977 letter from the Environmental Protection Agency to the County commission, which stated that as a condition of federal funding, "positive efforts [must] be made by recipients of Federal assistance to utilize minority-owned business sources for supplies and services, allowing these sources the maximum feasible opportunity to compete for contracts and subagreements to be performed utilizing federal grant funds." The letter advised the commission to develop a list of minority resources in the area, reform bidding practices to facilitate minority participation, furnish technical assistance to minority business people, provide a liaison between non-minority and minority business people, and inform all bidders of minority participation requirements.

2. MBEs are "enterprises which are more than fifty percent owned by women or members of designated minority groups." *Northeastern Florida Chapter of the Ass'n of General Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir.1990). For the purposes of this opinion, the term "minority" will include females. The term "MBE" will refer to minority enterprises in the construction business, not minority enterprises in general.

designed the program to comply with federal regulations on federally funded projects and to obtain information about minority business participation in non-federally funded contracting businesses in the County. The program was essentially voluntary; the County asked contractors to fill out forms detailing whether they had solicited MBE participation in making their bids on County construction projects.

In 1981, the Equal Opportunity Office ("EOO") began a study of the Hillsborough County MBE program. The study included surveys of the number of minority businesses in the County, the problems encountered by MBEs, and County expenditures to minority businesses. The study indicated that minorities were significantly underrepresented in County contracts. Nevertheless, the County commission refused to develop a race-based plan in 1982, urging the staff to redouble efforts under the MBE program. In 1984, however, the County found that in spite of the MBE program, minorities and women were receiving a disproportionately small percentage of the County's construction business. The County concluded that without some affirmative legal obligation placed on contractors, the voluntary MBE program would fail to ensure MBE participation in County contracting projects. The County, therefore, began developing a race-conscious MBE law.

During various workshops and seminars on the subject, the County attorney's office told the various officials that such a law could be enacted only to remedy clear instances of past discrimination, and that the law would have to be narrowly drawn. After considering various ways to comply with the County attorney's advice, the County passed Resolution R88–D173, the Hillsborough County MBE law, at a special commission meeting on June 29, 1988. The objective of the law was to take affirmative action to eliminate past discrimination in County construction by ensuring that con-

struction contractors and subcontractors provided equal opportunity employment to MBEs and increased participation by MBEs in all procurement activities. The law called for measures such as (1) arranging adequate time for submission of bids, (2) breaking large projects into several smaller projects to facilitate small business participation, (3) holding seminars or workshops to acquaint MBEs with County procurement activities, (4) providing contracting opportunities for professional services, and (5) penalizing bidders who violate the intent of the MBE program or federal and state laws prohibiting discriminatory preference in contracting. The resolution established an annual goal of twenty-five percent total MBE participation in County construction,[3] with twenty percent of the participation coming from economically disadvantaged MBEs. The County implemented the resolution on July 11, 1988.

Under the law, the Goal–Setting Committee ("GSC") sets an MBE participation goal for each project. In setting the goal, the GSC reviews the available and eligible MBE contractors and compares them with the various subcontractable areas on the project. If there are at least three eligible MBEs in a subcontractable area, an MBE goal is set for that area. Goals may not exceed fifty percent MBE participation. After the goals are set for the entire project, the GSC discusses the goals. It looks at such issues as the complexity of the work and the necessity for high quality work in a particular subcontractable area. The goal for the project then is firmly set by the GSC. The project is advertised and a pre-bid conference is scheduled. At the pre-bid conference, contractors may ask questions and discuss concerns, and the County has the opportunity to explain how the MBE requirements work. At any time prior to advertisement of the project, the MBE goals may be waived if minority participation cannot be achieved without detriment to public health, safety, or welfare,

---

**3.** Jacqueline Barr, the county equal opportunity and affirmative action manager, testified that the federal Department of Housing and Urban Development ("HUD") told the County to allocate twenty-five percent of HUD-funded housing to minorities. There was no testimony, however, that this was the basis for the twenty-five percent county-wide MBE participation goal in the law.

including the financial welfare of the County. The goals may not be waived once the project is advertised.

Next the County receives bids. The three lowest bids are transmitted to the manager of the MBE section for review. The low bidders have five days to submit their executed minority business contracts. The manager looks to see if the bids generally meet the MBE goals. If the goals are met, he recommends that the bid be awarded to the lowest bidder. If the MBE goals are not met by the lowest bidders, the bidders' good faith efforts are reviewed for "responsiveness."[4] Bidders whose bids are determined to be non-responsive are given time to submit protest letters to the Capital Projects Department. The Protest Committee decides whether to change the responsiveness determination. If the Committee doesn't change its determination and the next lowest bid is either $100,000 or fifteen percent higher than the low bidder, the MBE goal is waived and the low bidder receives the contract. If the next lowest bid is neither $100,000 or fifteen percent higher and the Protest Committee does not change the non-responsiveness determination, the County Administrator makes the final decision about whether to award the contract.

In the fiscal year including October 1989, MBE participation in the projects in which goals were set totalled 19.6%, 8.5% less than the total resolution goal but 7.6% higher than the percentage of minority contractors in the County. The contract value of the MBE projects totalled 15.6% of the total contract value awarded. Goals were waived in some projects. The County deemed five low bids non-responsive upon initial review, but determined after the good faith review that all five were responsive.

B. *Procedural History*

1. Injunction

On April 18, 1989, the Cone group filed a complaint for declaratory and injunctive re-lief in district court for the middle district of Florida. The complaint alleged that the Hillsborough County MBE law created an unconstitutional racial preference which violated the equal protection clause of the Fourteenth Amendment. The complaint stated that the Cone group consisted of present and potential future bidders on Hillsborough County construction contracts who were subject to the MBE law and were adversely affected by it. Along with their complaint, the Cone group filed a motion for a preliminary injunction, requesting the court to enjoin further operation of the MBE law. The court set the preliminary injunction hearing for May 2, 1989, but decided at that time that further briefing was needed and set a second hearing for June 16, 1989. At this time the court informed the parties that it had only two hours for the hearing. As a result, only one witness presented live testimony. All other witnesses testified by deposition.

On October 16, 1989, the district court granted the Cone group's motion for a preliminary injunction. *Cone Corp. v. Hillsborough County,* 723 F.Supp. 669 (M.D. Fla.1989). The court found that the Cone group had sustained irreparable injury because the MBE law perpetrated and extended the deprivation of their constitutional rights. Further, the court found a substantial likelihood that the Cone group would succeed on the merits under *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Without providing any comparative analysis or explanation of its conclusion, the court stated that the Hillsborough County law was identical to the Richmond plan held invalid in *Croson,* and stated that the County's defense of its law was a waste of time and resources. *Cone Corp.,* 723 F.Supp. at 678–79. The County filed a motion for clarification requesting that the court modify the injunction to exclude the federally-assisted projects which required the County to operate an MBE program.

---

**4.** Responsive bidders are those who exercised efforts to obtain quality MBE contractor partic- ipation before submitting their bids.

The court denied that motion on November 17, 1989.

### 2. Summary Judgment

On October 18, 1989, the Cone group moved for summary judgment, based on their claim that there was no proof indicating that the County or prime contractors had discriminated against MBE contractors. The County responded that they needed more time for discovery to produce evidence of racial discrimination. On November 17, 1989 the court denied the summary judgment motion with a permission to refile after an appropriate interval for discovery.

The County appealed the October 16, 1986 grant of preliminary injunction and then moved to stay that order. On December 28, 1989, the Cone group refiled their summary judgment motion. On January 19, 1990, this Court denied the motion for stay of the preliminary injunction pending appeal without prejudice and subject to renewal. On February 13, 1990, the district court granted the Cone group's summary judgment motion, ruling that the County had had adequate time to complete discovery. 730 F.Supp. 1568. On March 1, 1990, the district court entered a final order making the preliminary injunction permanent. The County filed notice of appeal from both the February 13 and March 1 orders. Those appeals have been consolidated, and this Court has granted a stay of the permanent injunction pending resolution of this appeal.

### 3. Present Appeal

■ On appeal, the parties have raised the following issues: whether the district court erred in granting summary judgment in favor of the Cone group on the grounds that the MBE law violated the equal protection clause, whether the district court erred in finding that the Cone group suffered irreparable injury sufficient to justify the grant of the preliminary injunction, and whether the permanent injunction is overbroad and should be modified to exclude federally funded projects. Because we find that the district court erred in granting summary judgment in favor of the Cone group, we do not reach the second and third issues.[5]

## II. ANALYSIS

### A. *Introduction*

In rejecting the Hillsborough County MBE law, the district court relied on *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). *Croson* involved a Richmond, Virginia MBE plan which required prime contractors awarded city construction contracts to subcontract at least thirty percent of the dollar amount of each contract to an MBE. Contractor Bonn wished to bid on a city project to install plumbing in the city jail. Seventy-five percent of the job involved provision of fixtures. Thus, in order to meet the thirty percent MBE set-aside requirement, Bonn had to hire an MBE to provide the fixtures. The only MBE interested in the project was unqualified and, as a result, Bonn lost the bid. *Id.* 109 S.Ct. at 715–716. A plurality of the Supreme Court

---

**5.** The County's challenge to the issuance of the preliminary injunction is moot regardless of our disposition of this case on its merits because a permanent injunction has issued. *Continental Training Services, Inc. v. Cavazos*, 893 F.2d 877, 880 (7th Cir.1990) (where a permanent injunction has been granted that supersedes the original preliminary injunction, appeal from an interlocutory preliminary order is properly dismissed); *New York State Nat. Organization for Women v. Terry*, 886 F.2d 1339, 1350 (2nd Cir. 1989), *cert. denied*, — U.S. —, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990) ("the appealability of the district court's grant of a preliminary injunction is moot ... because the district court subsequently granted a permanent injunction"); *Unit-*

ed States v. Local 30, United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Ass'n, 871 F.2d 401, 403 (3rd Cir.1989), cert. denied, — U.S. —, 110 S.Ct. 363, 107 L.Ed.2d 350 (1989) ("[o]nce the order granting the permanent injunction was entered, the order granting the preliminary injunction merged with it, and appeal is only proper from the order granting the permanent injunction."); Securities and Exchange Comm'n v. First Financial Group of Texas, 645 F.2d 429, 433 (5th Cir.Unit A 1981) (once an order of permanent injunction is entered, the preliminary injunction merges with it and appeal may be had only from the order of permanent injunction).

struck down the Richmond plan as a violation of the equal protection clause. *Id.* at 730.

Because disposition of this case revolves around the *Croson* opinion, we note at the outset what *Croson* did and did not do. The plurality holding did no more and no less than strike down the specific elements of the Richmond plan. It did not, as Justice Scalia would have had it do, limit a local government's authority to implement affirmative action plans to those instances constituting "a social emergency rising to the level of imminent danger to life and limb." *Croson,* 109 S.Ct. at 735. In fact, the plurality intimated that a locality could enact race-conscious legislation if such legislation was necessary to redress clear instances of discrimination and was narrowly tailored to achieve that goal. *Id.* at 720–722. On the other hand, neither did *Croson* provide a set of standards or guidelines describing the kind of MBE plan that would pass constitutional muster. It simply provided a stringent burden of proof for proponents of MBE laws to meet—they must be able to show that there were actual instances of past discrimination, that the MBE plan is necessary to remedy the discrimination, and that the plan is narrowly tailored to that goal. The Court described an outer perimeter of unacceptable behavior; plans which fall on or outside of that perimeter are clearly unconstitutional, while the constitutionality of plans which fall inside the perimeter apparently depends on the contours of the individual plan.

Although the Hillsborough County law appears similar to the plan struck down in *Croson,* the County argues that the plans are different enough to warrant a finding that the County plan falls well within the *Croson* perimeter. The district court did not address these differences. The court's opinion consists of (1) a detailed rendering of the Hillsborough County plan, (2) a sim-ilarly detailed breakdown of the *Croson* opinions, and (3) commentary regarding the court's displeasure with the absence of a stipulation of preliminary injunction.[6] The court did not explain how the County law failed to meet constitutional standards. After comparing the County law with the outer perimeter established in *Croson,* we conclude that the County law falls inside that perimeter and thus is constitutionally valid. In the discussion that follows, we first will recite the infirmities in the Richmond plan. We then will contrast the Hillsborough County plan to demonstrate why we find that the County plan survives constitutional scrutiny when the Richmond plan did not.

**B.** *Standard of Review*

■ Appellate review of a district court's grant of summary judgment is *de novo. Shipes v. Hanover Ins. Co.,* 884 F.2d 1357, 1359 (11th Cir.1989). We must decide whether there is any genuine issue of material fact raised by the evidence presented. *Id.* We must make this decision in light of the applicable constitutional standards. Like the Richmond plan, the Hillsborough County MBE plan is a race-conscious measure. When reviewing the constitutionality of such a measure, courts apply strict scrutiny. *Croson,* 109 S.Ct. at 721; *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 279, 106 S.Ct. 1842, 1849, 90 L.Ed.2d 260 (1986). Under strict scrutiny analysis, the racial classifications must be necessary and must be narrowly tailored to achieve the goal of remedying the effects of past discrimination. *Wygant,* 476 U.S. at 279–80, 106 S.Ct. at 1849–50.

The *Croson* plurality went into detail in explaining how strict scrutiny is applied to MBE plans. First, at a base minimum, any plan must have more than an amorphous claim that there has been discrimination in a particular industry. Where plans establish quotas, the quotas must be tied to

---

**6.** The district court stated,

> After spending valuable judicial time on this case, and after reviewing the *"best evidence"* brought forward by the defendants, the Court is at a loss to understand why there has been no stipulation for entry of a preliminary in-junction herein. This Court is forced to question the good faith of defendants in opposing the efforts of plaintiffs to suspend the MBE program of Hillsborough County, Florida.

*Cone Corp.,* 723 F.Supp. at 678.

some injury suffered by the minority to be benefitted. *Croson*, 109 S.Ct. at 724. In establishing this particularized discrimination, numerical disparities may be relevant if they result from a comparison of the number of qualified MBEs in the particular industry and geographic area with the number actually utilized in government contracts. At a minimum, however, the government entity must consider the number of qualified MBEs in the relevant market and the percentage of total city dollars minority firms receive. *Id.* at 725. Second, the plan must be narrowly tailored to remedy the discrimination. This means that the plan must be designed to further some goal other than outright racial balancing. Further, the government must have considered a race-neutral scheme before establishing the race-conscious scheme. *Id.* at 728.

## C. *Necessity of Racial Classifications*

■ The *Croson* plurality found that the city of Richmond had not proven that the racial classifications in its MBE plan were necessary. The Court acknowledged the deplorable past history of private and public discrimination which contributed to the lack of opportunities for minorities, but concluded that "an amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota." *Croson*, 109 S.Ct. at 724. The Court stated that the mere fact that the program was labelled "remedial" in nature was not sufficient to prove necessity. *Id.*

In particular, the *Croson* court faulted the following factual predicates on which Richmond based its plan:

(1) The Richmond plan purported to remedy general past discrimination in the entire construction industry, rather than discrimination in the Richmond area construction industry;

(2) The city adopted its plan based on non-racial factors contributing to the small number of MBEs;

(3) The city labelled its program "remedial," without proof of prior discrimination to support that label;

(4) The city based its decision to implement the plan in part on the fact that a city official who supported the plan felt that there was discrimination in the construction industry in the area and the state;

(5) The city relied on the disparity between the number of prime contracts awarded to MBE contractors and the total minority population of the city, rather than the disparity between the total number of contractors and the number of MBE contractors;

(6) The city did not know how many MBE contractors in the relevant market were qualified to undertake work on public projects;

(7) The city did not know what percentage of total city construction dollars MBE contractors received as subcontractors on city contracts;

(8) The city relied on evidence that MBE contractor membership in local contractors' associations was extremely low, without linking that fact to the number of local MBE contractors eligible for membership; and

(9) The city relied on Congress' finding in connection with the set-aside approved in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1979) that there had been nationwide discrimination in the construction industry.

Hillsborough County's MBE law is materially different from the Richmond plan, mainly because the Hillsborough County law was enacted as a result of statistics tabulated during the six years that the MBE program was in effect. These statistics indicated the following:

(1) An analysis of statistical data on minority businesses, which included a review of contracts awarded by the County over a three-year period, indicated that minorities (in particular blacks and women) were significantly underrepresented in such awards.

(2) According to data collected in 1983,[7] minorities made up ten percent of the business population in Hillsborough County. Narrowing the category to construction contractors, MBE contractors comprised twelve percent of the total contractor population of Hillsborough County.

(3) Between October 31, 1982 and July 31, 1983, 7.89% of the purchase orders awarded by the County were awarded to minorities. Of County dollars spent for purchases, 1.22% of the total County dollars expended went to minorities.

(4) Between July 12 and July 30, 1982, 6.3% of the total bids awarded by the County were awarded to minorities. Approximately 6.5% of the average dollar amount of the bids was awarded to minorities.[8]

(5) At least three people received a number of complaints alleging discrimination in County construction and procurement.

While some of the factors relied on by Hillsborough County are identical to those rejected in *Croson*,[9] other factors are markedly different. Unlike Richmond, Hillsborough County decided to implement its law based on statistics indicating that there was discrimination specifically in the construction business commissioned by the County, not just in the construction industry in general. The County documented the disparity between the percentage of MBE contractors in the area and the percentage of County contracts awarded to those MBE contractors. Hillsborough County determined the percentage of County construction dollars going to MBE contractors compared to the total percentage of County construction dollars spent. It is clear, in other words, that the County MBE law was not the result of some vague government desire to right past wrongs. The law resulted from prolonged studies of the local construction industry that indicated a continuing practice of discrimination.

The statistics gleaned from these studies provide a prima facie case of discrimination sufficient to clear the summary judgment hurdle.[10] The *Croson* Court stated that "[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination." *Croson*, 109 S.Ct. at 725 (quoting *Hazelwood School*

---

7. The studies also provided the following statistics for the percentage of County money going to MBE contractors in earlier years:

| 1979–80 | blacks | .03% |
| | hispanics | 2.24% |
| | female | 0.00% |
| 1980–81 | blacks | .03% |
| | hispanics | 1.94% |
| | females | .24% |

These statistics were taken, however, before a directory of MBEs in the area had been compiled. There is no way to compare these numbers to the number of qualified MBEs available during those years, so they have no relevance to a determination of whether they were the result of discrimination.

8. The total dollar amount awarded was $2,942,919.27. The bulk of this amount, however, consisted of a single bid for $2,257,327.10. After subtracting this disproportionately large bid, the total dollar amount for the remaining bids was $685,592.10, $44,917.25 of which went to minorities.

9. The Hillsborough County studies demonstrated that MBEs faced such primary obstacles as lack of access to capital, inability to obtain adequate surety bonding, and lack of capable managers and adequate training programs.

Justice O'Connor stated in *Croson*, however, that such evidence proves only "an amorphous claim that there has been past discrimination in a particular industry," *Croson*, 109 S.Ct. at 724, and does not justify the use of a quota. The Hillsborough County Commissioner who served between March 1983 and May 1985 stated that in his opinion, the county and prime contractors practiced discrimination. Justice O'Connor, however, clearly stated that such legislative allegations do not suffice to prove discrimination calling for racial classifications. *Croson*, 109 S.Ct. at 724 (sheer speculation as to how many minority businesses would exist absent past societal discrimination is not sufficient); 725 ("when a legislative body chooses to employ a suspect classification, it cannot rest upon a generalized assertion as to the classification's relevance to its goals").

10. At oral argument, counsel for the County stated that from the time the district court entered the preliminary injunction until the time this Court stayed that injunction pending appeal, not one subcontracting dollar on any County bid went to a black subcontractor. If true, this fact would clearly point to discrimination. The record, however, contains no evidence in support of counsel's contention.

*Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977)). The data extracted from the studies indicates that while ten percent of the businesses and twelve percent of the contractors in the County were minorities, only 7.89% of the County purchase orders, 1.22% of the County purchase dollars, 6.3% of the awarded bids, and 6.5% of the awarded dollars went to minorities. The statistical disparities between the total percentage of minorities involved in construction and the work going to minorities, therefore, varied from approximately four to ten percent, with a glaring 10.78% disparity between the percentage of minority contractors in the County and the percentage of County construction dollars awarded to minorities. Such a disparity clearly constitutes a prima facie case of discrimination indicating that the racial classification in the County plan were necessary.

Further, there was clear evidence that MBE contractors made numerous complaints to the County regarding discrimination by prime contractors. At least one witness, a former County commissioner, testified that MBE contractors had called his office during his tenure as commissioner and complained of discriminatory treatment. According to the complaints, when MBE contractors approached prime contractors, some prime contractors either were unavailable or would refuse to speak to them. Other prime contractors would accept estimates from MBE subcontractors and then not submit those estimates with their bids. Contrary to their practice with non-minority subcontractors, still other prime contractors would take the MBE subcontractors' bids around to various non-minority subcontractors until they could find a non-minority to underbid the MBE. Non-minority subcontractors and contractors got special prices and discounts from suppliers which were unavailable to MBE purchasers. The testimony regarding these complaints, combined with the gross statistical disparities uncovered by the County studies, provides more than enough evidence on the question of prior discrimination and need for racial classification to justify the denial of a motion for summary judgment.

### D. *Narrowly Tailored to Remedy Discrimination*

The *Croson* Court discussed several problems with the Richmond plan which demonstrated that that plan was not narrowly tailored to remedy past discrimination. First, Richmond did not consider the use of any race-neutral means to increase MBE participation before it instituted its MBE plan. *Croson*, 109 S.Ct. at 728. Second, the thirty percent participation goal set by Richmond's plan unrealistically assumed that minorities would choose the construction trade in "lockstep proportion" to their total representation in the local population. *Id.* The imposition of such a "rigid numerical quota" disturbed the Court because it showed no concern for whether a particular MBE seeking construction work under the plan had suffered from past discrimination. *Id.* at 729.

The Hillsborough County MBE plan differs from the Richmond program in these respects. Unlike Richmond, the County tried for six years to implement an MBE program whereby contractors would list their minority subcontractors and thereby become more aware and accountable regarding MBEs. It adopted the MBE law only when this MBE program failed to remedy the discrimination. Further, when the County passed the MBE law, it included in the law all of the race-neutral measures suggested in *Croson*.[11]

The twenty-five percent total MBE participation goal set by Hillsborough County, unlike Richmond's rigid thirty percent goal, is flexible. At oral argument, in fact, counsel for the County stated that the County

---

11. The *Croson* Court listed a "whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races," *Croson*, 109 S.Ct. at 729, including simplified bidding procedures, relaxed bonding requirements, and training and financial aid. While the *Croson* Court referred to these measures as alternatives to MBE plans, inclusion of such measures in an MBE plan would lend to the plan's flexibility. The County included these measures in its law.

actually uses a working goal of only nineteen percent. The number is not a quota, but exactly what it is called in the law—a goal. Neither does the twenty-five percent goal apply to every individual project. The GSC sets goals for each individual project based on the number of *qualified* MBE subcontractors available for each subcontractable area. If there are not at least three qualified MBE subcontractors available for the subcontractable area, *no goal is set* in that area. In areas where goals are set, no goal may ever exceed fifty percent MBE participation. At any time prior to advertisement of the project, the goals can be waived. A low bidder who does not meet the plan goals still can obtain a contract simply by demonstrating a good-faith effort to find MBE contractors. Even absent such good faith efforts, the contractor may still receive the contract if the next lowest bid is either $100,000 or fifteen percent higher than the non-responsive bidder.

Further, the Richmond plan was not "narrowly tailored" to remedy past discrimination in Richmond's construction industry because the set-aside requirement applied equally to African–Americans, Hispanics, Indians, Eskimos, and Asians, in spite of the fact that some of those groups were not represented in Richmond. The Richmond plan thus did more than remedy past discrimination, it benefitted groups against whom there may have been no discrimination. *Croson,* 109 S.Ct. at 728. The Hillsborough County law, unlike the Richmond plan, breaks its twenty-five percent MBE participation goal down by minority groups, targeting African–Americans, Hispanics, women, and "others".[12] The "others", groups such as Eskimos who may not be represented in the County and Asians and Indians who are represented in the County, are targeted for only one percent participation in the present law. Further, the County law targets its benefits to

those MBEs most likely to have been discriminated against—those MBEs disadvantaged in terms of size, volume of business, and number of employees. The premise behind this provision is that large and successful MBEs are likely to have overcome the effects of discrimination, while smaller, struggling businesses still suffer discrimination's ill effects. Those smaller businesses, therefore, get at least eighty percent, if not all, of the law's benefits. Again, these differences between the Richmond plan and the Hillsborough County law clearly raise issues of material fact sufficient to preclude the grant of summary judgment.

Even a cursory comparison of the Hillsborough County law and the Richmond plan demonstrates that the two are vastly different in critical areas. The County painstakingly crafted its law, and has carefully avoided the problems which caused the downfall of the Richmond plan. Under the County law, a contractor never faces the *Croson* situation, where in order to fill a rigid quota he or she is required to hire MBEs for a job that no MBEs are available, willing, or qualified to do. The County law incorporates all of the race-neutral measures which the *Croson* plurality recommended. It is difficult to understand how the district court could, without any kind of articulated comparative analysis, conclude that the Hillsborough County law is unconstitutional under *Croson.* We find that the County law differs dramatically from the Richmond plan struck down in *Croson* and that the facts warrant further development and scrutiny at a trial.

### III. CONCLUSION

For the reasons discussed above, we REVERSE the district court's grant of summary judgment. We DISMISS the County's appeal from the grant of preliminary injunction as moot, and REMAND the re-

---

**12.** The law breaks the 25% goal down as follows:

| | |
|---|---|
| Black | 10% |
| Hispanic | 7% |
| Women | 2% |
| Other | 1% |

| | |
|---|---|
| Total Economically Disadvantaged MBEs | 20% participation |
| Economically Nondisadvantaged MBEs | 5% participation |

maining issues for further proceedings consistent with this opinion.