The Honorable Pat Pappas State Representative 2901 Willow Pine Bluff, Arkansas 71603
Dear Representative Pappas:
This is in response to your request for an opinion regarding the constitutional validity of Ordinance No. 5566 of the City of Pine Bluff.
The ordinance, adopted March 7, 1994, provides in part as follows:
Section I. Affirmative Action Mandate
 A. The City of Pine Bluff hereby adopts a temporary five (5) year Affirmative Action Plan in an effort to increase the number of minorities and females in the City of Pine Bluff Civil Service positions. Accordingly, it shall be necessary to utilize race and gender as a factor in the hiring decisions. Such factors will only be considered if the potential candidate is otherwise qualified under the criteria set forth by the City.
 B. In order to correct an identified manifest imbalance, the City of Pine Bluff shall embark on an effort to increase the number of minority Civil Service employees in the uniformed departments by hiring at a percentage slightly higher than the racial and gender population of the City's relevant labor market.[1]
The ordinance indicates that the "manifest imbalance" exists "despite the nondiscriminatory hiring practices of the City. . . ." The ordinance states as a goal that the composition of the police and fire departments "closely reflect the racial and gender composition of individuals in the relevant labor market in Pine Bluff and Jefferson County." It also contains provisions requiring progress reporting and semi-annual assessment, and providing for recruiting activities and training.
You have asked for an opinion on whether the ordinance violates the Constitution of the Unites States or the Constitution of Arkansas.
It is important initially to clarify the nature of the ordinance's affirmative action mandate. You state that some of your constituents believe the ordinance establishes a "quota requirement," and I agree.
The same rules of construction apply whether a court is attempting to determine the meaning of a statute or an ordinance. Tackett v. Hess,291 Ark. 239, 723 S.W.2d 833 (1987). In construing either, "the primary object is to carry out the legislative intent which is determined primarily from the language of the statute [or ordinance] considered in its entirety." Thompson v. Younts, 282 Ark. 524, 527, 669 S.W.2d 471
(1988). Unless a different legislative intent is indicated, the words used are given their ordinary and generally accepted meanings, without resorting to a subtle or strained construction for the purpose of restricting or expanding the meaning. Id.
Applying these rules to the ordinance, it is fairly clear that the council intended to impose hiring quotas. The ordinance states that "it shall be necessary to utilize race and gender as a factor" and that the city will engage in "hiring [minorities and women] at a percentage slightly higher than the racial and gender population of the City's relevant labor market." These statements, in my view, constitute an affirmative command to the city's hiring officials (a) to consider race and gender in making hiring decisions, and (b) to ensure, during the period of effectiveness of the plan, that the percentages of women and minorities hired are greater than their percentage representations in the general population of the city and/or the county.
Courts closely examine all the facts and circumstances surrounding challenged affirmative action plans, as well as the applicable law, in determining their validity. Because there likely are numerous facts and circumstances relevant to the ordinance that are not apparent on its face, and because this office is not equipped to determine all the facts and circumstances surrounding the adoption, implementation, and operation of the plan set forth in the ordinance (indeed, such a determination is probably impossible except in the adversarial context of litigation), I am unable to render a conclusive opinion on the constitutional validity of the ordinance. It is my opinion, however, based solely on the facts set forth in the ordinance, that the ordinance is constitutionally suspect. I will attempt below to describe briefly the applicable constitutional law and explain how I reach my conclusion that the ordinance is constitutionally suspect, in the hope that the discussion will assist you and your constituents in finally assessing the validity of the ordinance.[2]
Nothing in the Constitution of the United States flatly prohibits a public employer from adopting a voluntary affirmative action plan that imposes racial hiring quotas or otherwise employs race as a factor to be considered in making hiring decisions. "When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the `narrow tailoring' test this Court has set out in previous cases." Adarand Constructors, Inc. v.Pena, No. 93-1814, slip op. at 22, 1995 WL 347345 (U.S. June 12, 1995), citing as an example United States v. Paradise, 480 U.S. 149 (1987). Seealso Wygant v. Jackson Bd. of Education, 476 U.S. 267 (1986). Neither does the Constitution absolutely preclude the adoption of a plan that takes gender into account. See Johnson v. Transportation Agency, SantaClara County, 480 U.S. 616, 620 at fn. 2 and 627 at fn. 6 (1987); Conlinv. Blanchard, 890 F.2d 811 (6th Cir. 1989). The Constitution does, however, impose significant constraints upon the affirmative action that may be undertaken by public employers.
As the language from Adarand Constructors quoted above indicates, there are two fundamental requirements that a public employer's affirmative action plan containing racial classifications[3] must meet in order to be unobjectionable on equal protection grounds. Justice O'Connor stated the two requirements in concise terms in the lead opinion in AdarandConstructors:
 [A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests.
Adarand Constructors, slip op. at 16.
As Justice O'Connor also stated, the inquiry, reduced to its simplest terms, is about ends and means. Adarand Constructors, slip op. at 21. A court will examine all the facts and circumstances surrounding an affirmative action plan employing racial classifications to ensure that there is a compelling reason for the government to desire the result, and to ensure that the mechanism designed to achieve the result is fair, reasonable, and narrowly-drawn. I will discuss the two requirements separately below and suggest how the race-based portions of the affirmative action plan in the ordinance might be assessed under the two requirements.
First, there must exist a compelling governmental interest that justifies the use of a racial classification. This compelling interest must underlie any racial classification, regardless of the legislative characterization of the classification (such as "benign" or "remedial") and regardless of whether the racial class disadvantaged by the classification is one that historically has been victimized or advantaged by governmental discrimination. Adarand Constructors, slip op. at 11-16;City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493-494 (1989).
What sort of interest is "compelling?" It appears that, in the public employment context, the only interest that will satisfy the test is an interest in remedying the effects of the public employer's prior or current race discrimination. Classifications based upon race must be "strictly reserved for remedial settings. . . ." Croson,488 U.S. at 493. "The Court is in agreement that . . . remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program." Wygant, 476 U.S. at 286 (O'Connor, J., concurring in part and concurring in the judgment). "Th[e] Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discriminations." Wygant, 476 U.S. at 274 (emphasis supplied).[4] The "Court's focus [is] on prior discrimination as the justification for, and the limitation on, a State's adoption of race-based remedies." Wygant,476 U.S. at 275. See also Adarand Constructors, slip op. at 22 (citingParadise, 480 U.S. at 167, as a case where the public employer's "pervasive, systematic, and obstinate discriminatory conduct" justified a race-based quota remedy).
It is clear that an express finding by a court (seeParadise,480 U.S. at 167), or by the public employer itself, if supported by convincing evidence (seeCroson, 488 U.S. at 500), of prior race discrimination by the public employer will provide the necessary evidence of a compelling interest. It is also clear that such a finding of prior discrimination is not an absolute requisite to the validity of an affirmative action plan. A remedial purpose "need not be accompanied by contemporaneous findings of actual discrimination to be accepted as legitimate as long as the public actor has a firm basis for believing that remedial action is required." Wygant, 476 U.S. at 286
(O'Connor, J., concurring in part and concurring in the judgment). The public employer's legislative body must, however, have a "strong basis in evidence for its conclusion that remedial action was necessary" before a remedy employing a racial classification will be justified. Wygant, 476 U.S. at 277.
If no express finding of prior discrimination is made, the only method apparent from the cases to attain a "strong basis" for remedial action is to demonstrate evidence of a wide statistical disparity between the racial composition of the government's employees and that of the relevant labor market. Such evidence, if carefully developed, may indeed justify the conclusion that the governmental employer has previously engaged in discriminatory practices and hence that an affirmative action plan is appropriate to remedy the effects of such practices. Croson,488 U.S. at 501; Wygant, 476 U.S. at 274; Hazelwood School Districtv. United States, 433 U.S. 299, 307-308 (1977). It appears that such statistical evidence must at least approach a level sufficient to make out a prima facie case of a constitutional or statutory violation.Croson, 488 U.S. at 500; Wygant,476 U.S. at 274-275.
 [D]emonstrable evidence of a disparity between the percentage of qualified blacks on a school's teaching staff and the percentage of qualified minorities in the relevant labor pool sufficient to support a prima facie Title VII pattern or practice claim by minority teachers would lend a compelling basis for a competent authority such as the School Board to conclude that implementation of a voluntary affirmative action plan is appropriate to remedy apparent prior employment discrimination.
Wygant, 476 U.S. at 292 (O'Connor, J., concurring in part and concurring in the judgment).
An issue has often arisen over the identification of the "relevant labor pool." Where the job at issue requires no special training, or where the question is admission to a training program that is designed to provide the expertise necessary to perform the job, a comparison with the general population is appropriate. Johnson, 480 U.S. at 631-632; see Teamsters v.United States, 431 U.S. 324 (1977) (no special training required), andUnited Steelworkers of America v. Weber, 443 U.S. 193 (1979) (training program). "Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications." Johnson, 480 U.S. at 632; see Hazelwood, 433 U.S. 299
(teacher hiring case; qualified public school teachers in relevant geographic area was appropriate group for comparison), and Croson,488 U.S. 469 (minority business set-aside case; qualified contractors in relevant geographic area was appropriate group for comparison).
In the case at hand, it appears that the city has attempted to justify its affirmative action plan (i.e., demonstrate its "compelling interest") wholly on the basis of statistical disparities between the racial composition of the uniformed civil service on the one hand, and the general population of the city and county of appropriate age on the other. There is no express finding of prior racial discrimination contained in the ordinance, and the city's assertion in the ordinance that the noted statistical disparities exist "despite [its] nondiscriminatory hiring practices" would seem to negate the possibility that the city made an express finding of prior racial discrimination that is evidenced elsewhere than in the ordinance. The question becomes, then, whether the city compared its civil service workforce with the relevant labor market and, if so, whether the statistical disparities shown are sufficient to demonstrate a compelling interest.
In my opinion, police and fire department hiring fall within the "special qualifications" category described above. See Vogel v. City ofCincinnati, 959 F.2d 594 (6th Cir. 1992) (police hiring case; those in relevant geographic area that were qualified to become police officers was appropriate group for comparison). It is also my opinion, therefore, that the general population of individuals of eligible age in the city and/or the county might well be found to be an inappropriate labor pool for comparison with the city's police and fire departments. While I assume that the city provides a new police officer or fireman much or all of the specialized training and education necessary to perform as such after he or she is employed by the city, the city also undoubtedly sets certain minimum qualifications including, I would expect, a high school diploma or the equivalent, the ability to perform certain physical tasks, and height and weight minimums and maximums. I have no way to know what proportion of the population of the city and county of eligible age meets these threshold hiring qualifications, and there may be no simple way to find out.[5] Nevertheless, the courts have made it clear that a government, in determining whether a remedy is appropriate and in formulating what the remedy should be, must make a rather precise assessment of what the racial composition of its labor force reasonablycould be in the absence of racial discrimination as a hiring factor. If there is a significant disparity between the composition of those qualified and the composition of the population as a whole, statistics describing the latter have little or no relevance and do not reflect what the city might reasonably expect if its hiring practices were truly color-blind. "When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." Hazelwood, 433 U.S. at 308, fn. 13. The city's comparison of its uniformed civil service with what may well be an inappropriate labor pool therefore raises the serious question of whether its interest in enacting the ordinance can fairly be characterized as compelling.
In the absence of a compelling interest, a race-based affirmative action plan cannot withstand constitutional scrutiny. As stated above, however, there likely are many relevant facts and circumstances that do not appear on the face of the ordinance, and it is possible that they could supply the city with the required compelling interest. I will, therefore, discuss the second fundamental requirement for a public employer's race-based affirmative action plan, which is that it be "narrowly tailored to remedy prior discrimination" so as to maintain a strong correlation between necessity and remedy and so as not to trammel unnecessarily the interests of those individuals not favored by the plan. Croson, 488 U.S. at 507; see also Adarand Constructors, slip op. at 16. "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."Adarand Constructors, slip op. at 11 (quoting Fullilove v. Klutznick,448 U.S. 448, 537 (Stevens, J., dissenting)).
 In determining whether race-conscious remedies are appropriate, [the Court] look[s] to several factors, including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.
Paradise, 480 U.S. at 171.
Is the plan at issue narrowly tailored? Some of its characteristics suggest that it may be. The plan is of limited duration (five years), and contains a provision providing for semi-annual assessments to allow for modifications to the plan during that period. The plan does not require the hiring of any unqualified person, the ordinance expressly stating that potential candidates must be otherwise qualified. Nothing in the plan suggests that it requires hiring at any time; the city remains free to determine when its needs justify hiring. The plan does not require that any person be laid off, and the Court has held that the denial of an employment opportunity is less burdensome than the loss of existing employment. Wygant, 476 U.S. at 282-283. Also, the plan does not work as an absolute bar to the hiring of any person.
Other aspects of the plan, however, suggest that it is not sufficiently narrowly tailored. As discussed above, the necessity for relief is open to substantial doubt on the facts set forth in the ordinance. If the general population is not the relevant labor pool, the city is left without any evidence on the face of the ordinance of past or present racial discrimination, strongly suggesting that the city's interest may be less than compelling and that a race-based plan is not narrowly tailored.
The ordinance contains no indication that the city considered race-neutral remedies, though evidence of such consideration may exist elsewhere. It may be that certain required qualifications for applicants, characteristics of the city's recruitment efforts, or other matters could be adjusted to increase minority hiring without significantly affecting the city's interests. If so, such adjustments would be constitutionally preferable to a race-based affirmative action plan.
While the plan is of limited duration, suggesting that attainment rather than maintenance of a particular racial composition is the plan's goal, the ordinance also states as its goal that the composition of the police and fire departments "closely reflect the racial and gender composition of individuals in the relevant labor market in Pine Bluff and Jefferson County." And while the ordinance does provide for periodic assessments of the results of the plan, nothing therein requires the city to modify or abandon the plan if its goals have been partially or fully realized before the passage of five years. The foregoing suggests that the city may also have desired the maintenance, rather than just the temporary attainment, of a specified racial composition. That goal is constitutionally impermissible. Croson, 488 U.S. at 507-508.
In addition, the ordinance does not define the word "minorities" in order to identify the persons who will be favored by the plan. As the Court has indicated, overinclusiveness in defining those who will be favored by a plan may suggest that the plan's goal is not remediation. Croson,488 U.S. at 506. I believe such overinclusiveness may also indicate that a plan is not sufficiently narrowly tailored particularly where, as here, the plan contains no evidence that "other minorities" have been the victims of hiring discrimination at the hands of the public employer.
Probably most damaging is the fact that the ordinance imposes hiring quotas, particularly without allowing for waivers, suggesting that the plan may be insufficiently flexible and impose an impermissible burden on those not favored by the plan. As your constituents point out, the ordinance may frustrate the city in satisfying its legitimate hiring needs during periods in which there are not sufficient numbers of qualified minority and female applicants. Formal waiver procedures, not provided by the ordinance, would permit the city to hire needed personnel even if the quotas of the plan could not be met. Quotas also impose a significant burden upon those not favored by the plan by completely foreclosing their access to a substantial number of positions, which are absolutely reserved for those favored by the plan. It is clear that quotas are an extreme remedy, to be employed only in the most compelling cases, and that plans employing quotas should have express waiver provisions. See, e.g., Paradise, 480 U.S. at 178; Fullilove,448 U.S. at 498 (Powell, J., concurring); and Regents of the University ofCalifornia v. Bakke, 438 U.S. 265, 319
(1978).
It is my view that a court might well find the plan not to be sufficiently narrowly tailored with respect to its racial classifications. While certain aspects of the plan would meet the test, others likely would not, and the cases indicate that a failure to meet the test on just one account is likely to be fatal. See, e.g., Wygant,476 U.S. at 283.
Laws making classifications on the basis of gender generally are subject to an intermediate level of scrutiny. Lehr v. Robinson, 463 U.S. 248
(1983); Craig v. Boren, 429 U.S. 190 (1976). This intermediate scrutiny is not as demanding as strict scrutiny, demanding a compelling interest and narrow tailoring, but is more exacting than the rational basis test, which merely requires that the classification be rationally or reasonably related to a legitimate governmental purpose. Gender-based laws will be upheld only if they are substantially related to the achievement of important governmental objectives. Lehr, 463 U.S. at 265-266; Craig,429 U.S. at 197.
Although there has been some difference of opinion among the Circuit Courts of Appeal, as well as commentators, whether intermediate scrutiny or strict scrutiny should apply in cases of gender-based affirmative action,[6] it is my opinion that intermediate scrutiny is appropriate and is dictated by the Supreme Court's decisions. The Court subjects racial classifications to strict scrutiny regardless of which racial group is favored. See Adarand Constructors, slip op. at 15, and Croson,488 U.S. at 493-494. Consistency with that rule would dictate that gender classifications be subjected to intermediate scrutiny regardless of which sex is favored. The Court in Adarand Constructors expressly cited consistency as one reason for its view that it is not proper to subject "benign" classifications to one test and "invidious" classifications to another. Adarand Constructors, slip op. at 15. Also, the Craig case, in which the Court applied the intermediate scrutiny test, actually involved discrimination against men. SeeCraig, 429 U.S. at 190.
Again, because the labor pool statistics contained in the ordinance might well be held to be irrelevant, it is my opinion that there is a substantial question whether an important governmental objective has been demonstrated. Without clear and relevant evidence that there has been past gender discrimination or at least that women are underrepresented in the uniformed civil service to a legally significant extent, establishment of an adequate basis for institution of the plan will be difficult or impossible. As is the case with race-based preferences, gender-based affirmative action should be based upon a comparison with the appropriate universe of qualified individuals. See Johnson,480 U.S. at 635-636.
I also believe the portions of the ordinance making gender-based classifications raise a significant question of whether the plan is substantially related to the achievement of the city's objective. The same aspects of the plan that were cited above as indicating that the race-based portions thereof may not be narrowly tailored apply with similar force to suggest that the gender-based portions may not be substantially related to the objective. In gender-based, as well as race-based affirmative action, quotas should be reserved for egregious factual situations, since they automatically exclude candidates from consideration. See Johnson, 480 U.S. at 637-638.
Finally, with respect to the Constitution of Arkansas, the Supreme Court of Arkansas has not articulated any difference in the protections afforded by the equal protection clauses of the Constitutions of the United States and of Arkansas, and I therefore do not separately address the plan under the Constitution of Arkansas. I expect that the Supreme Court of Arkansas, if faced with a case involving a challenge to an affirmative action plan based upon the equal protection guarantee contained in the Constitution of Arkansas, would look primarily to the decisions of the Supreme Court of the United States in reaching its decision.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General J. Madison Barker.
Sincerely,
WINSTON BRYANT Attorney General
WB:JMB/cyh
[1] Recitals to the ordinance set forth information about the gender and racial identification of invididuals in what is deemed the "relevant labor market" (defined as all individuals between the ages of 21 and 44, and based on 1990 census figures; statistics are given for both the City of Pine Bluff and Jefferson County, and the ordinance is not entirely clear about whether the city council deemed the city, the county, or both, to be the relevant labor market), and of the Pine Bluff Police Department and the Pine Bluff Fire Department (both as of February 1, 1994). That information is summarized in the table below:
 -------------------------------------------------------------------------------------
| | | Jefferson | | | | |
| | Pine Bluff % | Co. % | Police # | Police % | Fire # | Fire % |
|-----------------|--------------|-----------|----------|----------|--------|--------|
| White Males | 25.7% | 28.2% | 89 | 78.0% | 68 | 75.6% |
|-----------------|--------------|-----------|----------|----------|--------|--------|
| White Females | 21.8% | 28.2% | 4 | 3.5% | 0 | 0.0% |
|-----------------|--------------|-----------|----------|----------|--------|--------|
| Black Males | 22.5% | 19.8% | 20 | 17.5% | 21 | 23.3% |
|-----------------|--------------|-----------|----------|----------|--------|--------|
| Black Females | 29.8% | 22.8% | 1 | 1.0% | 0 | 0.0% |
|-----------------|--------------|-----------|----------|----------|--------|--------|
| Other Minorities| --- | 1.0% | 0 | 0.0% | 1 | 1.1% |
 -------------------------------------------------------------------------------------

The ordinance does not identify or state the number or percentage of "other minorities" in the relevant age group in the City of Pine Bluff. The percentage appears to be approximately 0.2%. The ordinance states that the single "other minority" person in the Pine Bluff Civil Service is a Hispanic male employed by the Fire Department.
[2] As your request relates only to the constitutionality of the ordinance, I do not address the requirements and prohibitions of applicable statutory law, primarily Title VII of the Civil Rights Act of 1964. The language of the ordinance suggests that the drafters were not unfamiliar with Title VII or with 29 C.F.R. Part 1608, the Guidelines on Affirmative Action of the Equal Employment Opportunity Commission. In any event, the Supreme Court has indicated that the Constitution places greater limitations upon affirmative action than does Title VII. Johnsonv. Transportation Agency, Santa Clara County, 480 U.S. 616, 627 at fn. 6 (1987).
[3] Gender classifications are considered separately near the conclusion of this opinion.
[4] The Court in Croson held, in the context of minority contractor set-asides, that a showing by a governmental actor that "it had essentially become a `passive participant' in a system of racial exclusion practiced by elements of the local construction industry," rather than a showing that it had itself engaged in discriminatory practices, could constitute the showing of the required compelling governmental interest. Croson, 488 U.S. at 492. In my view, however, the holding has no applicability in the context of public employment: there is no person or entity other than the public employer itself that could be responsible for past discrimination in its own employment practices.
[5] It may be permissible for the city to compare the racial (and gender) compositions of its labor force with those of the pool of qualified applicants for uniformed civil service positions. SeeHazelwood, 433 U.S. at 308, fn. 13, and Vogel, 959 F.2d at 600.
[6] Compare Cone Corp. v. Hillsborough County, 908 F.2d 908 (11th Cir. 1990), cert. denied, 498 U.S. 983 (1990), and Conlin v. Blanchard,890 F.2d 811 (6th Cir. 1989) (subjecting affirmative action programs making gender-based classifications to strict scrutiny), with Coral ConstructionCo. v. King County, 941 F.2d 910 (9th Cir. 1991), cert. denied,502 U.S. 1033 (1992), and Milwaukee County Pavers Ass'n v. Fiedler,922 F.2d 419 (7th Cir. 1991), cert. denied, 500 U.S. 954
(1991) (holding (in Fiedler, suggesting) that intermediate scrutiny is appropriate in cases of gender-based affirmative action). See also
Dyer, Gender-Based Affirmative Action: Where Does it Fit in the TieredScheme of Equal Protection Scrutiny?, 41 U. Kan. L. Rev. 591 (1993). Neither the Eighth Circuit nor the Supreme Court has squarely addressed the issue.